KAREN P. HEWITT
United States Attorney
REBEKAH W. YOUNG
Assistant U.S. Attorney
California State Bar No. 214859
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-7179
E-mail: rebekah.young@usdoj.gov

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE LOPEZ-SANCHEZ<br>a.k.a. Enrique Lopez-Arroyo,<br>FERNANDO OSUNA-HERNANDEZ,<br>JOSE FRANCISCO PEREZ-GOMEZ,<br><br>Defendants. | Criminal Case No. 08CR0337-H<br><br>**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTIONS:**<br><br>**(1) FOR DISCOVERY**<br>**(2) TO PRESERVE EVIDENCE**<br>**(3) TO DISMISS THE INDICTMENT**<br>**(4) FOR LEAVE TO FILE FUTURE MOTIONS**<br><br>**TOGETHER WITH STATEMENT OF THE CASE AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Date: March 24, 2008<br>Time: 2:00 p.m.<br>Court: The Hon. Marilyn L. Huff |

COMES NOW the plaintiff, UNITED STATES OF AMERICA, by and through its counsel, Karen P. Hewitt, United States Attorney, and Rebekah W. Young, Assistant United States Attorney, and hereby files its Response in Opposition to Defendant's Motion for Discovery and for Leave for File Further Motions. The Government's Response is based upon the files and records of the case together with the attached Statement of the Case, Statement of Facts, and Memorandum of Points and Authorities.

/ /

/ /

/ /

/ /

/ /

## I

## STATEMENT OF THE CASE

On February 7, 2008, a federal grand jury in the Southern District of California returned a three-count Indictment charging defendants Jose Lopez-Sanchez a.k.a. Enrique Lopez-Arroyo, Fernando Osuna-Hernandez, and Jose Francisco Perez-Gomez with Conspiracy to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and Possession of Marijuana with Intent to Distribute, in violation of 21 U.S.C. § 841(a)(1). In count three of the Indictment, defendant Lopez-Sanchez was further charged with Deported Alien Found in the United States, in violation of 8 U.S.C. §1326. On February 7, 2008, all three defendants were arraigned on the Indictment and entered a plea of not guilty.

## II

## STATEMENT OF FACTS

### A. SURVEILLANCE AND APPREHENSION OF THE DEFENDANT

#### 1. Border Patrol Spots Group of Suspected Illegal Aliens

On January 7, 2008, at approximately 7:30 p.m., Border Patrol Agent Jesus Martinez and Border Patrol Agent Michael Ambrosia were performing line watch duties in and around Jacumba, California. (Jacumba is located about 25 miles east of the Tecate, California Port of Entry and directly north of the United States/Mexico international boundary.) At this time, a seismic intrusion device activated in an area east of Jacumba. Border Patrol Agent Joseph Fistola was operating a thermal imaging camera from a high vantage point and scanned the general area of the sensor activation with his camera. From a distance of about one mile, Agent Fistola observed what appeared to be a group of suspected illegal aliens running toward the west entrance of O'Neil Valley. (This area is located at the base of Airport Mesa. Airport Mesa is a low mountain that extends into Mexico. This area is difficult to patrol and if often used as a crossing point for groups of illegal aliens as well as narcotics. Spotters will often sit atop Airport Mesa and direct the groups north while keeping a watchful eye on Border Patrol.) Agents Martinez and Ambrosia responded to the location and positioned themselves north of the suspected illegal aliens, and waited for the group to make its way north to them. While in position, the agents could clearly hear an individual speaking on a hand-held two-way radio, and another individual

responding to the speaker. (Two-way radio use is common among alien and narcotics smugglers in this area. The radios are often used to coordinate the initial crossing and loading of the illegal contraband.)

2. **Border Patrol Spots GMC Suburban and Ford F-150**

During this time, several agents assigned to plain clothes anti-smuggling duties in this area responded to assist. All the agents were in unmarked vehicles. Agent Gustavo Suarez and Agent Joseph Remenar saw a GMC Suburban, later determined to be bearing California license plate 4GQP298, pull into a Shell gas station south of Interstate 8 Jacumba exit. (This gas station was about one mile north of the suspected illegal aliens.) The GMC Suburban pulled up to the gas pumps behind a blue Ford F-150, later determined to be bearing Illinois license plate 37277G. When the driver of the GMC Suburban -- later identified as defendant Jose Francisco Perez-Gomez ("Perez") -- got out of his vehicle, he appeared nervous and repeatedly looked around, apparently scanning his surroundings for law enforcement officers. Based on these observations, in conjunction the recent sensor activation, and the group of suspected illegal aliens observed making their north nearby, as well as the agents' knowledge of alien and narcotics smuggling activity in the area and the vehicles that smugglers prefer to use, Agent Suarez contacted Border Patrol dispatch and requested a stolen vehicle / registered owner check on the GMC Suburban's license plate. The check revealed that the last known registered owner had filed a release of liability form in October 31, 2006, to California Auto Dealers Exchange in Anaheim, California. That same day, the car was sold to a car dealer in Tijuana, and there was no new registered owner on file. (Alien smuggling organizations will often use vehicles with incomplete registrations or releases of liability in order to mask the identities of the organization's members.)

Supervisory Border Patrol Agent Jeffrey Dinise, who was conducting anti-smuggling duties nearby, overheard this particular radio transmission. Agent Dinise then told Agent Suarez that he had seen the same GMC Suburban at the Golden Acorn casino about an hour ago. The GMC had drawn Agent Dinise's attention as well, and, like Agent Suarez, he had run a records check on the vehicle. (The Golden Acorn is a known rally point for alien and narcotics smugglers in the area.) Agents Suarez and Remenar watched as the Ford F-150 left the gas station and followed the GMC. Both vehicles got onto Interstate 8 heading east. Agent Remenar and Agent Hiram Cuevas, who was also conducting plainclothes anti-smuggling duties, followed the GMC and the Ford F-150 eastbound on Interstate 8.

After about a mile, both the GMC and the F-150 pulled over the shoulder of the freeway and stopped. (This is a common counter surveillance tactic and is often used to uncover any law enforcement vehicles that might be following them, and to force law enforcement to abandon their surveillance.) Agents Remenar and Cuevas passed the GMC and the F-150. Approximately one minute later, Supervisory Border Patrol Agent Mark Hansen, who was also conducting plainclothes anti-smuggling duties, entered Intestate 8 eastbound, and saw that both the GMC and F-150 had continued on their way. Agent Cuevas soon reported that both vehicles had exited Interstate 8 eastbound at the In-Ko-Pah exit and had re-entered Interstate 8 westbound, reversing their direction of travel. Senior Border Patrol Agent Benjamin Morrow assisted in following the vehicles at this point. Agent Cuevas soon reported that the F-150 was driving recklessly, pulling away from the GMC at about 90 miles an hour, and had cut dangerously close to Agent Cuevas' unmarked vehicle and a tractor trailer truck.

**3. Surveillance of the F-150**

Agents Cuevas and Morrow saw the F-150 get off at the Jacumba exit while the GMC continued westbound at a slow and steady pace. The agents determined that the F-150 was driven in a reckless manner and exited the freeway in order to draw attention away from the GMC, so they decided to follow the GMC and turned over surveillance of the F-150 to waiting agents. Agent Suarez had remained at the Shell gas station, so he took over surveillance of the F-150, while Agents Cuevas and Morrow followed the GMC. Agent Suarez observed the F-150 re-enter Interstate 8 eastbound, and he followed the vehicle. Agent Remenar caught up with the F-150 as well. The F-150 then exited Interstate 8 at the In-Ko-Pah exit and proceeded west on Old Highway 80 at a high rate of speed, heading toward the last known location of the group of suspected illegal aliens.

Within moments, Agents Ambrosia and Martinez saw the F-150 head westbound on Old Highway 80 and stop near the entrance of O'Neil Valley. (This stretch of Old Highway 80 is extremely desolate and is largely uninhabited. It is also a common load area for illegal aliens and narcotics.) The individuals' voices that Agents Ambrosia and Martinez had previously overheard became much louder – and closer – as the F-150 drew nearer to the location. One of the individuals yelled "Let's go!" and "Hurry!" in Spanish. The F-150 made a u-turn on Old Highway 80 and then turned into the entrance of O'Neil Valley. As the F-150 turned into the entrance, its headlights illuminated Agents Ambrosia

and Martinez, both of whom were in full Border Patrol uniform. The F-150 driver appeared confused and hesitated as to which directed he wanted to go, thus indicating to the agents that they had been spotted by the driver. One of the individuals yelled at the F-150's driver to stop, but the driver put the vehicle into reverse, did a three point turn, and headed east on Old Highway 80.

At this time, Agent Ambrosia saw one individual – later identified as defendant Jose Lopez-Sanchez ("Lopez") – run into Old Highway 80 and attempt to catch up with the F-150. As Lopez ran towards the vehicle, he yelled "Stop!" and "Wait!" to the driver. Agent Ambrosia turned on his flashlight, identified himself as Border Patrol agent, and ordered Lopez to stop. After spotting Agent Ambrosia, Lopez immediately began running away and ignored the agent's commands. The F-150 also sped away. While Lopez ran, he tossed his jacket onto Old Highway 80. After a brief foot chase, Agent Ambrosia apprehended Lopez. Agent Ambrosia identified himself as a Border Patrol agent, and asked Lopez what county he was a citizen of. Lopez stated that he was citizen and national of Mexico and did not possess any immigration documents that would allow him to enter or remain in the United States legally. After a pat down search of Lopez's immediate clothing, Agent Ambrosia found two cell phones, both in the "on" position. Agent Ambrosia also found a black, hand-held, two-way radio in the pocket of the jacket Lopez had tossed onto Old Highway 80. Like the cell phones, the radio was also in the "on" position. Lopez was placed under arrest at this time.

Additional Border Patrol agents responded to the location as the rest of the group fled southbound. As agents began to give chase, Agent Gerardo Mercado noticed that someone standing on top of Airport Mesa was aiming a red laser beam on the side of the marked vehicle. Given that the beam could have been a laser scope from a firearm, and that agents had actually been fired upon two days earlier in the same area when pursuing narcotics smugglers, the agents ended the chase and fell back. When the agents turned off the marked vehicle's headlights, the red beam was extinguished. During this time, Agent Fistola had followed the progress of the F-150 with his scope as it continued eastbound on Old Highway 80. After the F-150 was out of his view, Agent Fistola returned his attention to the area where the F-150 had attempted to load up illegal aliens. The agent maintained visual contact with the area and reported no activity since the initial foot pursuit.

As the foot pursuit of Lopez was unfolding, Supervisory Border Patrol Agent Mark Hansen watched the F-150 travel eastbound on Old Highway 80 at a high rate of speed. (Agent Hansen was traveling eastbound on Interstate 8 and was driving parallel to the F-150.) Based on the F-150 dangerous driving, as well the vehicle's attempted load up of illegal aliens at the O"Neil Valley entrance and the vehicles flight from Border Patrol, Agent Hansen authorized Agent William Western to deploy a controlled tire deflation device ("CTDD") in the path of the F-150 to prevent a dangerous pursuit. Agent Western deployed the device, but the F-150 continued eastbound and transitioned onto Interstate 8 eastbound. After a short distance, all four of the F-150's tires deflated and the driver – later identified as defendant Fernando Osuna-Hernandez ("Osuna") – brought the vehicle to a stop. Once the F-150 was a standstill, Agent Hansen activated his emergency lights and pulled in behind the F-150. Agent Hansen approached the vehicle, identified himself as a Border Patrol agent, and questioned the F-150's two occupants as to their citizenship and immigration status. Osuna presented a California identification card. The passenger – Miguel Angel Osuna-Hernandez – also presented a California identification card. Both stated that they were lawful permanent residents, although neither could produce a valid immigration document allowing them to enter or remain in the United States legally. Agent Hansen was informed of Lopez's illegal status and subsequent arrest, and placed both Fernando and Miguel Osuna-Hernandez under arrest for suspected alien smuggling.

**4. <u>Surveillance of the GMC Suburban</u>**

As the GMC Suburban approached the closed Pine Valley checkpoint on Interstate 8 westbound, Agent Dinise and Agent Cuevas performed a vehicle stop on the car. The GMC yielded without incident. Agent Dinise approached the driver of the GMC – defendant Perez, who was the sole occupant of the car – and questioned him as to his citizenship and immigration status. Perez said he was a United States citizen, and presented a California identification card. Within the GMC was a hand-held, two-way radio like the one seized from defendant Lopez. Based on the agents' earlier observations of the interactions between the F-150 and the GMC, Agent Dinise placed Perez under arrest for suspected alien smuggling and transported him to the Boulevard Border Patrol Station processing.

### 5. Duffle Bags Filled With Marijuana Located at Load Site

Within twenty minutes, agents returned to the area of the attempted load up to search for the remaining individuals. Agent Sean Collins arrived with his narcotic detector dog and searched the area. The dog soon directed Agent Collins to green military style duffle bag, which was found to contain marijuana. The duffle bag was located in the middle of the entrance access road, directly in line with where the F-150 had stopped and hastily reversed direction. Agents then found six more similar green, military style duffle bags, along with one onion sack, scattered in a line running southwest from the first bag towards the direction the group had been heading in as it approached the entrance. Agents recovered eight bags in all, which contained 16 packages of marijuana, weighing approximately 164 kilograms.

## B. POST-MIRANDA STATEMENTS

### 1. Fernando Osuna-Hernandez

Osuna was advised of and waived his Miranda rights. He then told the agents that on today's date, he had been recruited to assist in the smuggling of both illegal aliens and narcotics into the United States, and that he did so in order to rebuild trust within the organization he works for after prior cooperation with law enforcement. According to Osuna, the GMC Suburban was the designated vehicle to load both the illegal aliens and narcotics. After picking up defendant Perez at the San Ysidro Port of Entry in the GMC, Osuna and his brother Miguel, drove to a residence in Spring Valley and picked up the F-150. At that point, Osuna got into the F-150 and Perez took over driving duties for the GMC. Before proceeding to the load up site, all three spent about an hour at the Golden Acorn casino. After spending time at the Golden Acorn, Osuna traveled in front of the GMC, serving as the GMC's scout. He noticed that the GMC suddenly slowed down behind him and Osuna became scared, believing that the GMC had been apprehended by law enforcement. At that point, he drove away at a high rate of speed before being apprehended by Border Patrol.

### 2. Jose Francisco Perez-Gomez

Perez was advised of and waived his Miranda rights. According to Perez, Osuna did not pick him up at the San Ysidro Port of Entry, and said that someone else picked him up at the port and dropped him off at a gas station somewhere off of State Route 125. Then two other individuals dropped

off the GMC for him to drive, and he followed them to the Golden Acorn. The two individuals introduced him to two other people in a pick-up truck, and then left without ever setting foot inside the casino. According to Perez, he went into the casino and later left in the GMC to go home to San Diego but got onto Interstate 8 eastbound, which is the wrong direction. Nevertheless, he continued heading eastbound, past an exit where he could easily make a u-turn, and traveled another five miles to a gas station. After getting a drink at the gas station, he again went eastbound on Interstate 8. After another five miles, he took the In-Ko-Pah exit and saw a pick-up truck leaving the same area. He followed the truck back westbound until being stopped by Border Patrol.

**III**

**DEFENDANT'S DISCOVERY MOTION**

The initial 156 pages of discovery provided in this case included reports of each of the defendants' arrest, and prior apprehensions, as well as his rap sheet, and photographs from the date of arrest. Additional discovery requests are discussed below.

**(1) Defendant's Statements**

The Government recognizes its obligation, under Rules 16(a)(1)(A) and 16(a)(1)(B), to provide to Defendant the substance of Defendant's oral statements and Defendant's written statements. (Unless otherwise noted, all references to "Rules" refers to the Federal Rules of Criminal Procedure.) The Government has produced all of Defendant's statements that are known to the undersigned Assistant U.S. Attorney at this date. If the Government discovers additional oral or written statements that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be promptly provided.

**(2) Arrest Reports, Notes, and Dispatch Tapes**

The Government has provided Defendant with all known reports related to Defendant's arrest in this case. The Government is not aware of the existence of any dispatch tapes relevant to this case. The Government will continue to comply with its obligation to provide to Defendant all reports subject to Rule 16. The Government has no objection to the preservation of the agents' handwritten notes. See United States v. Harris, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original notes of interviews of an accused or prospective government witnesses). However, the Government objects to providing the defendants with a copy of the rough notes at this time. The Government is not required

to produce the notes pursuant to the Jencks Act because the notes do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the witness. United States v. Spencer, 618 F.2d 605, 606-07 (9th Cir. 1980). The notes are not Brady material because, as discussed further, the notes do not present any material exculpatory information or any evidence favorable to either defendant that is material to guilt or punishment. If, during a future evidentiary hearing, certain rough notes become particularly relevant, the notes in question will be made available to the defendants.

**(3) Brady Material**

The Government has and will continue to perform its duty under Brady v. Maryland, 373 U.S. 83 (1963) to disclose material exculpatory information or evidence favorable to Defendant when such evidence is material to guilt or punishment. The Government recognizes that its obligation under Brady covers not only exculpatory evidence, but also evidence that could be used to impeach witnesses who testify on behalf of the United States. See Giglio v. United States, 405 U.S. 150, 154 (1972); United States v. Bagley, 473 U.S. 667, 676-77 (1985). This obligation also extends to evidence that was not requested by the defense. Bagley, 473 U.S. at 682; United States v. Agurs, 427 U.S. 97, 107-10 (1976). "Evidence is material, and must be disclosed (pursuant to Brady), 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Carriger v. Stewart, 132 F.3d 463, 479 (9th Cir. 1997) (en banc). The final determination of materiality is based on the "suppressed evidence considered collectively, not item by item." Kyles v. Whitley, 514 U.S. 419, 436-37 (1995).

Brady does not, however, mandate that the Government open all of its files for discovery. See United States v. Henke, 222 F.3d 633, 642-44 (9th Cir. 2000) (per curiam). Under Brady, the United States is not required to provide: (1) neutral, irrelevant, speculative, or inculpatory evidence (see United States v. Smith, 282 F.3d 758, 770 (9th Cir. 2002)); (2) evidence available to the defendant from other sources (see United States v. Bracy, 67 F.3d 1421, 1428-29 (9th Cir. 1995)); (3) evidence that the defendant already possesses (see United States v. Mikaelian, 168 F.3d 380-389-90 (9th Cir. 1999) amended by 180 F.3d 1091 (9th Cir. 1999)); or (4) evidence that the undersigned Assistant U.S. Attorney could not reasonably be imputed to have knowledge or control over. See United States v.

Hanson, 262 F.3d 1217, 1234-35 (11th Cir. 2001). Brady does not require the Government "to create exculpatory evidence that does not exist," United States v. Sukumolahan, 610 F.2d 685, 687 (9th Cir. 1980), but only requires that it "supply a defendant with exculpatory information of which it is aware." United States v. Flores, 540 F.2d 432, 438 (9th Cir. 1976).

**(4) Information That May Result in a Lower Sentence Under the Guidelines**

The Government has provided and will continue to provide Defendant with all Brady material that may result in mitigation of Defendant's sentence. Nevertheless, the Government is not required to provide information bearing on Defendant's sentence until after conviction or guilty plea and prior to his sentencing date. United States v. Juvenile Male, 864 F.2d 641, 647 (9th Cir. 1988) (holding that no Brady violation occurs "if the evidence is disclosed to the defendant at a time when the disclosure remains in value").

**(5) Defendant's Prior Record**

The Government has provided Defendant with a copy of his known prior criminal record and, consequently, has fulfilled its duty of discovery under Rule 16(a)(1)(D). See United States v. Audelo-Sanchez, 923 F.2d 129 (9th Cir. 1990). To the extent that the Government determines that there are any additional documents reflecting Defendant's prior criminal record, the Government will provide those to the Defendant.

**(6) Any Proposed 404(b) Evidence**

The Government will disclose in advance of trial the general nature of any "other bad acts" evidence that the Government intends to introduce at trial pursuant to Fed. R. Evid. 404(b). Evidence should not be treated as "other bad acts" evidence under Fed. R. Evid. 404(b) when the evidence concerning the other bad acts and the evidence concerning the crime charged are "inextricably intertwined." United States v. Soliman, 812 F.2d 277, 279 (9th Cir. 1987). The Government objects to providing Defendant with complete vehicle crossing reports from the Treasury Enforcement Communications System ("TECS"). TECS reports are not subject to Rule 16© because the reports are neither material to the preparation of the defense, nor intended for use by the Government as evidence during its case-in-chief. The TECS reports are not Brady material because the TECS reports do not

present any material exculpatory information or any evidence favorable to Defendant that is material to guilt or punishment.

**(7) Evidence Seized**

The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all evidence seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the Government as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant.

**(8) Request for Preservation of Evidence**

The Constitution requires the Government to preserve evidence "that might be expected to play a significant role in the suspect's defense." California v. Trombetta, 467 U.S. 479, 488 (1984). To require preservation by the Government, such evidence must (1) "possess an exculpatory value that was apparent before the evidence was destroyed," and (2) "be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. at 489; see also Cooper v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001). The Government has made every effort to preserve evidence it deems to be relevant and material to this case. Any failure to gather and preserve evidence, however, would not violate due process absent bad faith by the Government that results in actual prejudice to the Defendant. See Illinois v. Fisher, 540 U.S.1174, 124 S.Ct. 1200 (2004) (per curiam); Arizona v. Youngblood, 488 U.S. 51, 57-58 (1988); United States v. Rivera-Relle, 322 F.3d 670 (9th Cir. 2003); Downs v. Hoyt, 232 F.3d 1031, 1037-38 (9th Cir. 2000).

**(9) Henthorn Material**

The Government will comply with United States v. Henthorn, 931 F.2d 29 (9th Cir. 1991) and request that all federal agencies involved in the criminal investigation and prosecution review the personnel files of the federal law enforcement inspectors, officers, and special agents whom the Government intends to call at trial and disclose information favorable to the defense that meets the appropriate standard of materiality. United States v. Booth, 309 F.3d 566, 574 (9th Cir. 2002) (citing United States v. Jennings, 960 F.2d 1488, 1489 (9th Cir. 1992). If the undersigned Assistant U.S.

Attorney is uncertain whether certain incriminating information in the personnel files is "material," the information will be submitted to the Court for an in camera inspection and review.

**(10) Tangible Objects**

The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy tangible objects that are within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the Government as evidence during its case-in-chief at trial, or was obtained from or belongs to Defendant. The Government need not, however, produce rebuttal evidence in advance of trial. United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984). As noted above, color copies of the vehicle will be provided once the Government receives them.

**(11) Expert Witnesses**

The Government will comply with Rule 16(a)(1)(G) and provide Defendant with a written summary of any expert testimony that the United States intends to use during its case-in-chief at trial under Rules 702, 703, or 705 of the Federal Rules of Evidence.

**(12) Impeachment Evidence**

As previously discussed, the Government recognizes its obligation under Brady and Giglio to provide material evidence that could be used to impeach Government witnesses.

**(13) Evidence of Criminal Investigation of Any Government Witness**

Defendant is not entitled to any evidence that a prospective witness is under criminal investigation by federal, state, or local authorities. The Government is under no obligation to turn over the criminal records or rap sheet of its potential witnesses. United States v. Taylor, 542 F.2d 1023, 1026 (8th Cir. 1976). The Government will, however, provide the conviction record, if any, which could be used to impeach witnesses the United States intends to call in its case-in-chief.

**(14) Evidence of Bias or Motive to Lie**

The Government recognizes its obligation under Brady and Giglio to provide evidence that could be used to impeach Government witnesses including material information regarding demonstrable bias or motive to lie.

**(15) Evidence Affecting Perception, Recollection, Ability to Communicate, or Veracity**

The Government recognizes its obligation under Brady and Giglio to provide material evidence that could be used to impeach Government witnesses including material information related to perception, recollection, ability to communicate, or truth telling. The Government strenuously objects to providing any evidence that a witness has ever used narcotics or other controlled substance, or has ever been an alcoholic because such information is not discoverable under Rule 16, Brady, Giglio, Henthorn, or any other Constitutional or statutory disclosure provision.

**(16) Witness Addresses**

The Government has already provided Defendant with the reports containing the names, work addresses, and telephone numbers of the inspectors, officers and special agents whom asked questions of Defendant and found the marijuana in the vehicle. In its trial memorandum, the Government will provide Defendant with a list of all witnesses whom it intends to call in its case-in-chief, although delivery of such a witness list is not required. See United States v. Discher, 960 F.2d 870 (9th Cir. 1992); United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987). The Government strenuously objects to providing the home addresses or the home or personal cellular telephone numbers to Defendant. In non-capital cases, the Government is not even required to disclose the names of its witnesses prior to trial. United States v. Dishner, 974 F.2d 1502, 1522 (9th Cir 1992); (citing United States v. Steel, 759 F.2d 706, 709 (9th Cir. 1985)); United States v. Hicks, 103 F.23d 837, 841 (9th Cir. 1996); see also United States v. Bejasa, 904 F.2d 137 (2d Cir. 1990) (holding that United States did not improperly deny defendant access to government witnesses whose telephone numbers and addresses the government refused to provide because defendant knew the identities of the government witnesses and presumably knew their telephone numbers or could have contacted them through the exercise of due diligence).

**(17) Name of Witnesses Favorable to the Defendant**

The Government is not aware of the names of any witnesses favorable to the Defendant's case. If the Government discovers any witnesses favorable to Defendant, the names of such witnesses will be promptly provided.

**(18) Statements Relevant to the Defense**

The Government will provide all statements relevant to Defendant as required by Rule 16, Brady, and Jencks. The Government is not all possible information and evidence regarding any speculative defense claimed by Defendant. Wood v. Bartholomew, 516 U.S. 1, 6-8 (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery of admissible exculpatory evidence are not subject to disclosure under Brady).

**(19) Jencks Act Material**

Rule 26.2 incorporates the Jencks Act, 18 U.S.C. §3500, into the Federal Rules of Criminal Procedure. The Jencks Act requires that, after a Government witness has testified on direct examination, the Government must give the Defendant any "statement" (as defined by the Jencks Act) in the Government's possession that was made by the witness relating to the subject matter to which the witness testified. 18 U.S.C. §3500(b). For purposes of the Jencks Act, a "statement" is (1) a written statement made by the witness and signed or otherwise adopted or approved by her, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. §3500(e). If notes are read back to a witness to see whether or not the government agent correctly understood what the witness was saying, that act constitutes "adoption by the witness" for purposes of the Jencks Act. United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing Goldberg v. United States, 425 U.S. 94, 98 (1976)).

**(20) Giglio Information**

An agreement that the Government makes with a witness for testimony in exchange for money or in exchange for favorable treatment in the criminal justice system is generally subject to disclosure as impeachment evidence under Brady and Giglio. See United States v. Kojayan, 8 F.3d 1315, 1322-23 (9th Cir. 1993); Benn v. Lambert, 238 F.3d 1040, 1054-60 (9th Cir. 2002). The Government is not aware of any Giglio information related to this case. If the Government discovers the existence of Giglio information, the information will be provided to the Defendant.

**(21) Agreements Between the Government and Witnesses**

As noted above, the Government is not aware of any Giglio information at this time. If the Government discovers such information in the future, the Giglio information will be provided.

**(22) Informants and Cooperating Witnesses**

At this time, the Government is not aware of any confidential informants or cooperating witnesses involved in this case. The Government must generally disclose the identity of informants where (1) the informant is a material witness, or (2) the informant's testimony is crucial to the defense. Roviaro v. United States, 353 U.S. 53, 59 (1957). If there is a confidential informant involved in this case, the Court may, in some circumstances, be required to conduct an in-chambers inspection to determine whether disclosure of the informant's identity is required under Roviaro. See United States v. Ramirez-Rangel, 103 F.3d 1501, 1508 (9th Cir. 1997). If the Government determines there is a confidential informant somehow involved in this case, it will either disclose the identity of the informant or submit the informant's identity to the Court for an in-chambers inspection.

**(23) Bias by Informants or Cooperating Witnesses**

At this time, the Government is not aware of any confidential informants or cooperating witnesses involved in this case. If the Government discovers the existence of confidential informants or cooperating witnesses who are either a material witness, or whose testimony is crucial to the defense, the inducements, favors, payments or threats made (if any) or any other Giglio information related to the confidential informant or cooperating witness will be provided to Defendant.

**(24) Personnel Records of Government Officers Involved in the Arrest**

The Government objects to Defendant's request that the Government reveal all citizen complaints, and internal affair inquiries into the inspectors, officers, and agents who were involved in this case – regardless of whether the complaints or inquiries are baseless or material and regardless of whether the Government intends to call inspectors, officers, and agents to testify. As previously noted, the Government will comply with Henthorn and disclose to Defendant all material incriminating information regarding the testifying inspectors, officers, and special agents.

**(25) Training of Relevant Law Enforcement Officers**

The Government strenuously objects to providing to Defendant a copy of all policies, training instructions, and manuals issued by all law enforcement agencies involved in this case. The requested policies, training instructions, and manuals are irrelevant and do not fall within the scope of Rule 16, or any other statutory or Constitutional disclosure provision. Even if one or more of the inspectors,

officers, or special agents violated his or her own administrative regulations, guidelines, or procedures, such violations would not result in the exclusion of evidence if Defendant's Constitutional and statutory rights were not violated in this case. United States v. Caceres, 440 U.S. 741, 744 (1979); United States v. Hinton, 222 F.3d 664 (9th Cir. 2000).

**(26) Performance Goals and Policy Awards**

The Government strenuously objects to providing Defendant with information regarding the agency standards used for measuring, compensating, or reprimanding the conduct of all law enforcement officers involved in this case. The requested information regarding the agency standards used for measuring, compensating, or reprimanding the conduct of the law enforcement officers is irrelevant and does not fall within the scope of Rule 16, exculpatory evidence under Brady, impeachment evidence under Giglio, or any other authority governing disclosure.

**(27) Report of Scientific Tests or Examinations**

As noted above, the Government has provided Defendant with the results of the Drug Enforcement Administration laboratory tests on the marijuana seized in this case in accordance with Rule 16(F). The Government will provide Defendant with any further scientific tests or examinations. If the Court orders a re-weigh of the marijuana in this case, the Government will comply with the Court's order. Finally, as discussed above, the TECS records will not be provided at this time.

**(28) Residual Request**

The Government has already complied with Defendant's residual request for prompt compliance with Defendant's discovery requests.

## IV

## DEFENDANT'S GRAND JURY MOTION

To the best of undersigned AUSA's knowledge, the grand jury panel utilized in this case was not the panel instructed by Judge Burns in January 2007. Furthermore, even if that particular panel did hand down the indictment in this case, this Court has previously and repeatedly ruled on, and rejected, an identical motion filed in several cases in this district. The Government respectfully request that his Court do so here.

**V**

**DEFENDANT'S MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

The Government does not oppose Defendant's request for leave to file further motions, as long as such motions are based on discovery not yet received by Defendant.

DATED: March 21, 2008

Respectfully Submitted,

KAREN P. HEWITT
United States Attorney

/s/ ***Rebekah W. Young***
REBEKAH W. YOUNG
Assistant U.S. Attorney

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, v. JOSE LOPEZ-SANCHEZ a.k.a. Enrique Lopez-Arroyo, FERNANDO OSUNA-HERNANDEZ, JOSE FRANCISCO PEREZ-GOMEZ, Defendants. | Criminal Case No. 08CR0337-H<br><br>CERTIFICATE OF SERVICE |

IT IS HEREBY CERTIFIED THAT:

I, REBEKAH W. YOUNG, am a citizen of the United States and am at least eighteen years of age. My business address is 880 Front Street, Room 6293, San Diego, California 92101-8893.

I am not a party to the above-entitled action. I have caused service of **GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR DISCOVERY** on the following parties by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Kris Kraus
Gary Burcham
Charles Rees

I hereby certify that I have caused to be mailed the foregoing, by the United States Postal Service, to the following non-ECF participants on this case:

None

the last known address, at which place there is delivery service of mail from the United States Postal Service.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 21, 2008.

/s/ ***Rebekah W. Young***
REBEKAH W. YOUNG
Assistant U.S. Attorney